UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
                                              :
UNITED STATES OF AMERICA,          :
                                              :        **ECF CASE**
                    v.                          :
                                              :        S4 12 Cr. 121 (RJS)
MICHAEL STEINBERG,               :
                                              :
                    Defendant.            :
                                              :
                                              :
———————————————————— x


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT MICHAEL STEINBERG'S PRETRIAL MOTIONS FOR
REMEDIAL MEASURES TO ADDRESS PRETRIAL PUBLICITY
AND FOR A BILL OF PARTICULARS**

Barry H. Berke
Steven S. Sparling
Robin M. Wilcox

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100  (Phone)
(212) 715-8000  (Fax)

*Counsel for Defendant Michael Steinberg*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 1

I.    MODEST REMEDIAL MEASURES ARE NECESSARY TO ENSURE THAT
MR. STEINBERG RECEIVES A FAIR TRIAL ........................................................... 12

    A.    Given the Pervasive and Prejudicial Pretrial Publicity, a Juror
Questionnaire  Is Necessary to Protect Mr. Steinberg's Fair Trial Rights ............. 12

        1.    The Nature and Extent of the Media Coverage at Issue Here Risks
Undermining Mr. Steinberg's Fair Trial Rights ....................................... 13

            (a)    The Coverage Presumes Mr. Steinberg's Guilt ........................... 14

            (b)    The Coverage Exposes Potential Jurors to Prejudicial
Information Not Admissible at Trial............................................. 15

            (c)    The Coverage Includes Prejudicial Commentary Regarding
Testimony and Documentary Evidence That Is Expected
To Be Introduced at Trial.............................................................. 16

        2.    A Juror Questionnaire, Combined with Individual Questioning of Jurors
As Needed, Will Assist the Court in Identifying and Addressing Juror Bias
.................................................................................................................... 18

        3.    The Government Has Little Basis to Oppose the Use of A Juror
Questionnaire or Individualized Voir Dire ............................................... 20

    B.    The Publicity Prior to Trial May Require Additional Remedial Measures........... 22

II.    The Government Should Supply a Final and Sufficiently Detailed Bill of
Particulars Sooner, Not Later, Than It Did in the Newman/Chiasson Case .................... 23

    A.    Given Its Repeated Assertions of Readiness, the Government Should Be
Prepared To Provide Final Particulars No Later than Monday, August 19,
2013 ..................................................................................................................... 23

    B.    Only a Final Bill of Particulars Can Satisfy the Important Purpose of
Minimizing Unfair Surprise as to the Stocks at Issue and Identities of
Alleged Co-Conspirators.......................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Coleman v. Kemp,*
    778 F.2d 1487 (11th Cir. 1985) ...................................................................................11

*Estes v. Texas,*
    381 U.S. 532 (1965) ........................................................................................................8

*Jordan v. Lippman,*
    763 F.2d 1265 (11th Cir. 1985) ...................................................................................14

*Marshall v. United States,*
    360 U.S. 310 (1959) ......................................................................................................10

*Rideau v. Louisiana,*
    373 U.S. 723 (1963) ........................................................................................................8

*Sheppard v. Maxwell,*
    384 U.S. 333 (1966) ........................................................................................................8

*Skilling v. United States,*
    130 S. Ct. 2896 (2010) ....................................................................................7, 8, 14, 15

*United States v. Awadallah,*
    457 F. Supp. 2d 246 (S.D.N.Y. 2006) ...........................................................................9

*United States v. Beckner,*
    69 F.3d 1290 (5th Cir. 1995) .........................................................................................9

*United States v. Bin Laden,*
    92 F. Supp. 2d 225 (S.D.N.Y. 2000) ...........................................................................22

*United States v. Bortnovsky,*
    820 F.2d 572 (2d Cir. 1987) .........................................................................................22

*United States v. Dioguardi,*
    147 F. Supp. 421 (S.D.N.Y. 1956) ..............................................................................10

*United States v. Eisen,*
    CR-90-00018, 1991 WL 180400 (E.D.N.Y. Sept. 3, 1991) .........................................17

*United States v. Fastow,*
    292 F. Supp. 2d 914 (S.D. Tex. 2003) .........................................................................15

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*United States v. Feola,*
    651 F. Supp. 1068, 1131-34 (S.D.N.Y. 1987) ........................................................................25

*United States v. Friedman,*
    854 F.2d 535 (2d Cir. 1988) .................................................................................................17

*United States v. Gigante,*
    729 F.2d 78 (2d Cir. 1984).....................................................................................................11

*United States v. Gilbert,*
    668 F.2d 94 (2d Cir. 1981) ....................................................................................................10

*United States v. Haynes,*
    398 F.2d 980 (2d Cir. 1968).....................................................................................................8

*United States v. King,*
    140 F.3d 76 (2d Cir. 1998).....................................................................................................13

*United States v. Lino,*
    No. 00-CR-632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ..........................................24

*United States v. Lord,*
    565 F.2d 831 (2d Cir. 1977)..................................................................................................10

*United States v. Marcus,*
    628 F.3d 36 (2d Cir. 2010)....................................................................................................21

*United States v. Oruche,*
    No. 07-CR-124 (WHP), 2008 WL 612694 (S.D.N.Y. Mar. 5, 2008)....................................24

*United States v. Pomponio,*
    517 F.2d 460 (4th Cir. 1975) ................................................................................................10

*United States v. Quinones,*
    511 F.3d 289 (2d Cir. 2007)..................................................................................................13

*United States v. Rahman,*
    189 F.3d 88 (2d Cir. 1999)....................................................................................................13

*United States v Riggi,*
    541 F.3d 94 (2d Cir. 2008)....................................................................................................10

*United States v. Savin,*
    No. 00 CR. 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ......................................25

## TABLE OF AUTHORITIES (cont'd)

Page(s)

*United States v. Simon*,
  664 F. Supp. 780 (S.D.N.Y. 1987),
  *aff'd sub nom. Application of Dow Jones & Co.*, 842 F.2d 603 (2d Cir. 1988) ....................11

*United States v. Stewart*,
  433 F.3d 273 (2d Cir. 2006) ..................................................................................................13

*United States v. Trampnell*,
  638 F.2d 1016 (7th Cir. 1980) ...............................................................................................10

*United States v. Torres*,
  128 F.3d 38 (2d Cir. 1997) .......................................................................................................9

*United States v. Torres*,
  901 F.2d 205 (2d Cir. 1990) .......................................................................................................

*United States v. Whitten*,
  610 F.3d 168 (2d Cir. 2010) ..............................................................................................13, 15

*United States ex rel. Bloeth v. Denno*,
  313 F.2d 364 (2d Cir. 1963) .....................................................................................................9

### OTHER AUTHORITIES

*ABA Standards for Criminal Justice, Fair Trial and Free Press* § 8-3.5(a) (3d ed. 1991) ...........14

## INTRODUCTION

Defendant Michael Steinberg respectfully submits this memorandum of law in support of his motion for limited remedial measures to address the risk of prejudice from the intense media storm surrounding this case and the investigations and prosecutions of S.A.C. Capital Advisors, L.P. ("SAC"), and those associated with it.  Specifically, Mr. Steinberg respectfully requests that the Court (i) authorize the use of a juror questionnaire focused on the extraneous publicity and commentary of which each potential juror may be aware and hold an opinion, (ii) allow individualized questioning of jurors who have been exposed to the prejudicial media reports, and (iii) permit Mr. Steinberg to seek additional relief if it becomes apparent based on the continuing press coverage as the trial approaches that further remedial steps are needed to protect Mr. Steinberg's right to a fair trial.

Additionally, Mr. Steinberg respectfully requests that the government be compelled to produce a final bill of particulars by August 19, 2013.  Though the government has agreed to identify the stocks that it may claim at trial Mr. Steinberg traded based on illegally-obtained, material, non-public information and provide the identities of all of Mr. Steinberg's alleged co-conspirators, the government has refused to commit to those particulars until close to trial.  Timely disclosure of particulars on which Mr. Steinberg can rely is necessary for him to adequately prepare for trial.

## BACKGROUND

On March 29, 2013, the United States Attorney's Office for the Southern District of New York ("USAO") charged Mr. Steinberg with insider trading and conspiracy to commit insider trading in violation of federal securities laws based on his role as a portfolio manager at Sigma Capital Management, LLC ("Sigma").  Sigma is an affiliate of SAC, a hedge fund founded by

Steven Cohen.  For almost a year, stories about alleged insider trading involving Mr. Steinberg, Mr. Cohen, SAC and the legal troubles of others associated with SAC have saturated media outlets.

Since September of 2012, for example, Mr. Steinberg has been mentioned in at least 203 original articles, appearing both in print and online, and alleged insider trading at SAC Capital has been mentioned in at least 931 original articles.  *See* Declaration of Robin Wilcox, dated July 8, 2013 ("Wilcox Decl.") at ¶ 5.[1]  *The New York Times*, *Wall Street Journal*, and *New York Post* have together run at least 181 stories since September regarding Mr. Steinberg and/or SAC Capital in connection with alleged insider trading, including fifteen on the front page and twenty-one on the front page of the business section.  *Id.*  Four of the front page articles referencing Mr. Steinberg are attached at pages 1through 9 of Exhibit C to the Wilcox Declaration.  Similarly, since September 2012, national and local broadcast news on cable TV and radio have covered Mr. Steinberg and/or SAC Capital in connection with insider trading allegations at least 497 times, with Mr. Steinberg mentioned by name in 85 of those broadcasts.  *Id.* ¶ 6.

Mr. Steinberg's arrest itself was covered extensively by virtually all the major media outlets in this venue.  *Id.*  A video of Mr. Steinberg's arrest was broadcast online and replayed on cable outlets, including on NY1.  *Id.*; *id.*, Ex. B.  News of his arrest also spread via Twitter and online webcasts.  *Id.*  Mr. Steinberg and/or SAC Capital were the subject of 531 Tweets, and 3,454 re-Tweets, the majority of which came from news organizations.  *Id.*

---

[1]    For the convenience of the court, certain of the documents referenced herein are provided as exhibits to the Wilcox Declaration.  An index compiling 931 articles referencing insider trading and either (1) Mr. Steinberg; (2) SAC; or (3) Mr. Cohen is attached as Exhibit A to the Wilcox Declaration.  A similar index compiling broadcast programs and "tweets" is attached as Exhibit B to the Wilcox Declaration.

In addition to this coverage of Mr. Steinberg, there is the coverage of Mr. Cohen, SAC, and those associated with SAC, which the press itself has  has characterized the coverage of Mr. Cohen, SAC and those associated with SAC as "a crescendo," "[involving] a rash of media stories," and a "sea" of coverage. *Id.* ¶ 3.  It also has noted that "[t]he chase [for Cohen] has been well documented" and observed that "[t]he knives are out – and the media feeding frenzy is on – for Steven A. Cohen and his $15 billion hedge fund, SAC Capital Advisors." *Id.*

The coverage has not only been ubiquitous, but its qualitative content also has been inflammatory, thereby heightening the risk that it could interfere with the ability of potential jurors to assess impartially the government's case against Mr. Steinberg and Mr. Steinberg's defense.  In particular, we are concerned about the media's routine association of Mr. Steinberg with others suspected, accused or convicted of insider trading, which could cause a reader to presume his guilt.  Mr. Steinberg is frequently placed on a list of current or former SAC employees accused or found guilty of breaking the law.  *See*, *e.g.*, *id.*, Ex. C at 10-11 (Wall St. J.), 1-2 (Wall St. J.), 12 (Bus. Insider), 14 (N.Y. Times).  For example, in a graphic entitled "Insider Trading Cases at a Top Hedge Fund" and published online on the day of Mr. Steinberg's arrest and in print the day after his arrest, *The New York Times* featured a picture of Mr. Cohen with spokes pointing to pictures of other current or former SAC employees, including Mr. Steinberg, Mathew Martoma, Donald Longueul, Noah Freedman, John Horvath, and Wesley Wang.  Mr. Steinberg has the word "indicted," highlighted in yellow, next to his picture, as does Mr. Martoma, another former SAC portfolio manager indicted in an unrelated case who is scheduled to go to trial in November.  The others are described, in red, as "guilty." *Id.*, Ex. C at 3-4 (N.Y. Times) & 14.  The introduction explains: "At least nine current or former SAC employees have been tied to allegations of insider trading while working at the hedge fund.  SAC

settled two civil insider trading lawsuits for $616 million earlier this month."  Graphics like these, as well as articles keeping a similar tally of those at SAC tied to insider trading scandals, have been a routine part of the reporting of the story.  *Id.*, Ex. D at 15 (Vanity Fair); *id.*, Ex. E at 1-4, 5-6 (N.Y. Times and Wall St. J.).

Similarly presumptive of guilt, the press has focused on the culture at SAC, which has been variously described as a "nest of illegal insider trading," a "shark tank," "cutthroat," "ruthless," and "stained [by insider trading]."  *Id.*, Ex. E at 7 (Daily Intelligencer) and 8 (Bus. Insider); *id.*, Ex. D at 3 (Vanity Fair); *id.*, Ex. E at 10, 12 (N.Y. Times).  The reporting further suggests that SAC's trading successes are too good to be true.  For example, a *New York Times* article, "Case casts Deeper Shadow On A Hedge Fund Mogul," quotes author Sebastian Mallaby as saying: "SAC's extraordinary profits have always been something of a market mystery.  As more lawsuits implicate former SAC traders, we may at least understand where SAC's profits come from."  *Id.*, Ex. E at 14.  Similarly, a *Forbes* article discussing Mr. Steinberg's arrest reported: "The illegal activity at SAC has been pervasive: at least nine current or former SAC traders and analysts are linked to illegal trades . . . ."  *Id*, Ex. E at 15.

And there can be no question that the coverage has directly linked Mr. Steinberg to both Mr. Cohen and the salacious allegations regarding SAC, as the headlines themselves attest: "ANOTHER ONE: Veteran SAC Capital Trader Arrested," "Another SAC Capital Trader Arrested," "Trading Probe Reaches Higher–Top SAC Lieutenant, Accused of Profiting from Inside Information, Led Off in Handcuffs Before Dawn."  *Id.*, Ex. F at 1 (Bus. Insider), 2 (Daily Beast); *id.*, Ex. C at 1 (Wall St. J.).  In that same vein, Mr. Steinberg is regularly described as "a trusted lieutenant of Mr. Cohen," as "one of SAC's most veteran employees," *id.*, Ex. C at 4 (N.Y Times), a "[t]op SAC [l]ieutenant," *id.*, Ex. C  at 1 (Wall St. J.), Mr. Cohen's "golden boy,"

*id.*, Ex. F at 3 (Huffington Post), and one of Mr. Cohen's "most trusted manager[s]," *id.*, Ex. F at 4 (Bloomberg).

The descriptions of Mr. Steinberg's longstanding association with SAC and his importance to Mr. Cohen are particularly concerning when considered against the background of the media's portrayal of Mr. Cohen.  Although no criminal charges have been filed against Mr. Cohen, articles have nevertheless referred to him as "public enemy number one," *id.*, Ex. E at 15 (Forbes), the "OJ Simpson of insider trading," "the Godfather," *id.*, Ex. D at 2, 3  (Vanity Fair), one of "America's Top 10 Greediest People of 2012," *id.*, Ex. G at 5 (Huffington Post), "the Teflon Don of Wall Street," *id.*, Ex. G at 9 (Time), a member of "the Wharton mafia," *id.*, Ex. G at 12 (Associated Press), "a stubbornly evasive law-enforcement target," *id.*, Ex. G at 13 (N.Y. Mag.), and "an organized-crime boss who sat atop a corrupt organization," *id.*, Ex. C at 4 (N.Y. Times).

In addition, the press has devoted extraordinary attention to the question of whether the government's multi-year investigation will result in the filing of criminal charges against Mr. Cohen and/or SAC or regulatory charges against Mr. Cohen.  *Id.*, Ex. G at 14-15 (Reuters); *id.,* Ex. H at 1-2, 3-4 (Reuters).  As to Mr. Cohen, the following headlines are representative:  "The Feds are Closing in on Steve Cohen," *id.* ¶ 4, "The Clock is Tick-Tick-Ticking for Steve Cohen," *id.* ¶ 4 (Forbes), "Insider Inquiry Inching Closer to a Billionaire," *id.*, Ex. E at 1 (N.Y. Times), "The Hunt for Steve Cohen," *id.*, Ex. D at 1 (Vanity Fair), "Stoolie Turns up Heat on Steve," *id.* ¶ 4 (N.Y. Post), "The Feds Must Chase Down King Cohen," *id.*, Ex. E at 15 (Forbes) and "Turning up the Heat on SAC's Cohen," *id.* ¶ 4 (N.Y. Bus. J.).  Cartoons and caricatures of Mr. Cohen have been used to highlight the government's interest in Mr. Cohen, such as an image of Mr. Cohen's face on the body of a shark to illustrate the headline "Federal Investigators Circling

Steve Cohen." *Id.*, Ex. H at 5 (N.Y. Mag.); *see also id.*, Ex. D at 1 (Vanity Fair).   The recent issuance of grand jury subpoenas to SAC employees also was disclosed and received significant media scrutiny, as did Mr. Cohen's apparent decision to invoke the Fifth Amendment, Ex. H at 6-8 (N.Y. Times), 9-10 (N.Y. Post), 11-12 (N.Y. Times), 13 (Daily Beast), and still more recent reports speculating that prosecutors will not be able to bring criminal charges against Mr. Cohen, *id.*, Ex. I at 4 (Business Insider), 5 (Bloomberg).

SAC's settlement with the SEC has been widely covered as well, with prominent mention of the fact that the consent decree "related to trading by Mr. Steinberg and another portfolio manager at SAC's Sigma Unit." *Id.*, Ex. C at 2 (Wall St. J.); *id.*, Ex. I at 6-7 (Dow Jones), 8 (N.Y. Observer).   The articles reference that regulators expect to bring additional charges in the future.   *Id.*, Ex. ¶ I at 9-10  (Wall St. J.); *id.*, Ex. I at 11-12 (N.Y. Times).   The press also has widely documented the decisions of investors to withdraw funds from SAC in light of the onslaught of negative publicity and the continuing speculation that criminal or additional regulatory charges will be brought against it and/or its founder.   *Id.,* Ex. H at 5 (N.Y. Mag.), 6-8 (N.Y. Times).

Lastly, numerous articles discuss the specific evidence and testimony the government is expected to introduce at trial, as well as the government's protracted efforts to bring criminal charges against Mr. Cohen by, among other things, linking Mr. Steinberg to Mr. Cohen.  Many of these articles discuss the purported significance of emails to the government's case between Mr. Horvath (a cooperating witness for the government and former SAC research analyst for Mr. Steinberg) and Mr. Steinberg, and do so in a manner that suggests the government's case against Mr. Steinberg is strong, and that Mr. Steinberg could be a key witness against Mr. Cohen.  For example, a *Wall Street Journal* article published just *today* suggests that the government has

been trying to charge Mr. Cohen criminally by, among other things, connecting him to Mr.

Steinberg, and hoped to obtain Mr. Steinberg's cooperation against Mr. Cohen. *Id.*, Ex. G at 1-3

(Wall St. J.). This article referenced an August 26, 2008 email chain between Mr. Steinberg, Mr.

Horvath, and another SAC portfolio manager, containing a statement from Mr. Horvath that he

had a "2d hand read from someone at the company" (Indict. ¶ 14.a.), and cited the portion of the

email suggesting that Steinberg "had discussed possible Dell trading with Mr. Cohen." *Id.* This

is just one of many news articles reporting on this email and other emails that the government is

expected to rely on at trial, as well as purported statements of Mr. Horvath to government

officials, commenting on the purported relevance of this information to Mr. Steinberg's case, and

speculating on whether the government can establish a link to Mr. Cohen through Mr. Steinberg.

*See, e.g.*, *id.*, Ex. D at 9-11, 15 (Vanity Fair); *id.*, Ex. J at 11-13 (Wall St. J.); *id.*, Ex. C at 1-2

(Wall St. J.); *id.*, Ex. K at 8-9 (Business Week); *id.*, Ex. F at 10-11 (CNBC).

## ARGUMENT

**I.    MODEST REMEDIAL MEASURES ARE NECESSARY TO ENSURE THAT MR. STEINBERG RECEIVES A FAIR TRIAL**

    A.    Given the Pervasive and Prejudicial Pretrial Publicity, a Juror Questionnaire Is Necessary to Protect Mr. Steinberg's Fair Trial Rights

"[A] basic requirement of due process" is that a jury's "verdict must be based upon the

evidence developed at the trial" and not influenced by adverse pretrial publicity. *Irvin v. Dowd*,

366 U.S. 717, 722 (1961) (voiding conviction and sentence following trial preceded by

voluminous, prejudicial newspaper, radio, and television coverage) (citations omitted). Courts

must guard against the potential for pretrial publicity to interfere with the ability of jurors to

maintain and apply the requisite "'mental attitude of appropriate indifference.'" *Skilling v.

United States*, 130 S. Ct. 2896, 2917 (2010) (quoting *Ristaino v. Ross*, 424 U.S. 589, 594-95

(1976)); *see also Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966); *Estes v. Texas*, 381 U.S. 532,

538 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 725 (1963); *Irvin*, 366 U.S. at 722; *United States v. Haynes*, 398 F.2d 980, 987 (2d Cir. 1968) (observing that "undue influence resulting from excessive pretrial publicity is a sufficient basis for challenging a juror for cause").

It is therefore widely recognized that where a case gives rise to extensive and inflammatory pretrial publicity, the prudent course is to employ prophylactic measures designed to safeguard a defendant's right to trial by an impartial venire. *Sheppard*, 384 U.S. at 363 ("[W]e must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception."); *see also Skilling*, 130 S. Ct. at 2919 (declining to reverse where trial court, *inter alia*, screened venire members by eliciting responses to questionnaire largely drafted by defendant and where, by trial, "decibel level of media attention diminished somewhat").

       1.     *The Nature and Extent of the Media Coverage at Issue Here*
                  *Risks Undermining Mr. Steinberg's Fair Trial Rights*

The publicity surrounding Mr. Steinberg's case and the related investigation of SAC and Mr. Cohen has been staggering in its breadth and highly prejudicial in its content, including wall-to-wall coverage, saturating every possible media outlet; the routine association of Mr. Steinberg's name with the names of others formerly employed at SAC who have been convicted or charged with insider trading; the constant disparagement of Mr. Cohen and the allegedly corrupt culture of SAC, combined with the descriptions of Mr. Steinberg's close relationship to Mr. Cohen and prominence at SAC; the intrigue surrounding every legal development in the government's pursuit of Mr. Cohen and SAC; and the steady drumbeat accompanying the constant speculation as to whether criminal or other charges will be brought against Mr. Cohen or SAC. We respectfully submit that remedial measures designed to identify jurors' unwitting biases caused by exposure to extraneous and highly prejudicial information from the extensive

- 13 -

and overwhelmingly negative pretrial publicity regarding this case are necessary to guarantee Mr. Steinberg's right to a fair trial. *See*, *e.g.*, *United States v. Awadallah*, 457 F. Supp. 2d 246, 250, 254 (S.D.N.Y. 2006) (given significant pretrial publicity caused by September 11 attacks, choosing impartial jury "will require," among other things, "a comprehensive juror questionnaire" and "attorney input on the content of the voir dire"); *see also United States v. Torres*, 128 F.3d 38, 47 (2d Cir. 1997) (noting that "bias of a juror will rarely be admitted by the juror himself, partly because . . . the juror may be unaware of it" (citation and quotation marks omitted)).

(a)     The Coverage Presumes Mr. Steinberg's Guilt

The underlying themes of the coverage – its overwhelming negativity and its constant linking of Mr. Steinberg with others who are suspected of, charged with, or guilty of insider trading and his employment at an organization widely described as having a culture that encourages insider trading – presume Mr. Steinberg's guilt and therefore present the risk that the publicity may induce jurors to ignore their obligation to presume Mr. Steinberg's innocence, impartially review the evidence, and render a not guilty verdict unless the government proves Mr. Steinberg's guilt beyond a reasonable doubt. *See*, *e.g.*, *United States ex rel. Bloeth v. Denno*, 313 F.2d 364, 372 (2d Cir. 1963) (concluding jury did not meet Fourteenth Amendment impartiality standards where "publicity was in its nature highly inflammatory, in volume great, and accessibility universal"); *United States v. Beckner*, 69 F.3d 1290, 1292-94 & n.3 (5th Cir. 1995) (reversing conviction of defendant who, in a motion for extended voir dire, had submitted forty-eight newspaper articles and videotape excerpts from eight local television news broadcasts – some of which focused on the defendant, and others of which focused on other figures and events in question).

- 14 -

(b)    The Coverage Exposes Potential Jurors to Prejudicial
Information Not Admissible at Trial

Courts routinely acknowledge the real risk that the ability of jurors to render a fair and

impartial verdict can be undermined by exposure, through pretrial publicity, to prejudicial facts

that are not properly admitted at trial.  *See, e.g.*, *Marshall v. United States*, 360 U.S. 310, 312

(1959) (per curiam) (granting new trial where, as a result of pretrial publicity, jurors were

exposed to evidence that the trial judge had excluded).[2]

These concerns are squarely implicated by the media coverage here, which routinely

includes reference to highly prejudicial information that would not be admissible at Mr.

Steinberg's trial and therefore should not be considered, even unwittingly, by jurors weighing the

evidence and rendering a verdict.  This reporting includes, for example, references to:  (1) the

guilty pleas entered by former SAC employees who are not expected to be witnesses at Mr.

Steinberg's upcoming trial, *see United States v. Riggi*, 541 F.3d 94, 102 (2d Cir. 2008)

(constitutional error to admit a plea allocution by a co-conspirator who does not testify at trial);

(2) the widespread suggestion that Mr. Cohen must have encouraged insider trading at SAC; (3)

SAC's settlement with the SEC, which is widely reported to relate to trading by Mr. Steinberg,

*United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981) (Federal Rule of Evidence 408 bars

---

[2]    *See also, e.g.*, *United States v. Lord*, 565 F.2d 831, 837-39 (2d Cir. 1977) (reversing
convictions where trial court refused to poll jurors as to their knowledge of articles containing
potentially prejudicial and inadmissible information); *United States v. Trapnell*, 638 F.2d 1016,
1022-23 (7th Cir. 1980) (reversing convictions where district court inadequately addressed
pretrial publicity that may have exposed jurors to inadmissible and prejudicial information
including defendant's criminal history, fact that defendant rejected a plea deal, and fact that two
co-defendants pled guilty); *United States v. Pomponio*, 517 F.2d 460, 462-63 (4th Cir. 1975)
(reversing convictions where trial court failed to question jurors about exposure to news articles
that referenced inadmissible matters, including defendants' refusal to testify and courtroom
proceedings conducted in jury's absence); *United States v. Dioguardi*, 147 F. Supp. 421, 422-23
(S.D.N.Y. 1956) (adjourning trial where news concerning defendant's forthcoming trial was
"interwoven" with numerous media accounts of alleged co-conspirators' convictions).

admission of settlement with SEC to prove liability in subsequent proceedings); (4) Mr. Cohen's

invocation of the Fifth Amendment in response to the grand jury subpoena recently issued to

him; and (5) the government's multi-year investigation of Mr. Cohen and SAC, which may or

may not result in the filing of additional criminal or other charges.

> (c)   The Coverage Includes Prejudicial Commentary Regarding
> Testimony and Documentary Evidence That Is Expected
> To Be Introduced at Trial

Courts also have frequently acknowledged the threats to jury impartiality that are posed

by pretrial publicity bearing on the prospective evidence.  *See*, *e.g.*, *United States v. Simon*, 664

F. Supp. 780, 789-90, 796 (S.D.N.Y. 1987) (noting potential prejudice in highly publicized cases

resulting from "statements concerning the merits of the case, the character of the defendants, the

identity or credibility of potential witnesses, or the quality or content of evidence"), *aff'd sub*

*nom. Application of Dow Jones & Co.*, 842 F.2d 603 (2d Cir. 1988).  These cases recognize that

such publicity can prevent jurors from reaching their own independent conclusions regarding the

import or significance of evidence they are asked to consider in rendering their verdict.  *See*

*United States v. Engleman*, 489 F. Supp. 48, 50-51 (E.D. Mo. 1980) (ordering change in venue

where pretrial publicity included "specific testimony of essential witnesses" and other "areas of

particular sensitivity").[3]

The pretrial coverage here has included detailed and prejudicial commentary regarding

the meaning of certain emails and testimony that the government will seek to introduce at trial.

---

[3]   *See also United States v. Gigante*, 729 F.2d 78, 81-82 (2d Cir. 1984) (expressing approval of measures district court undertook during loansharking trial to determine whether jurors were prejudiced by mid-trial media articles linking defendant to mob and referencing mob involvement in loansharking); *Coleman v. Kemp*, 778 F.2d 1487, 1532, 1538 (11th Cir. 1985) (holding that petitioner was deprived of a fair trial where, *inter alia*, news articles described cooperating witness' testimony before trial such that "there was an overwhelming showing in the press of petitioner Coleman's guilt before his trial ever began").

As discussed above, *see supra* at 7-8, there are many news articles reporting and commenting on these emails, as well as purported statements of Mr. Horvath to government officials, and speculation on whether the government can establish a link to Mr. Cohen through Mr. Steinberg. *See, e.g.*, *Wilcox Decl.*, Ex. J. at 11-13 (Wall St. J.) (describing the details of what Mr. Horvath allegedly told the government during a meeting, including that "he was pressured by his manager to gather inside information on technology stocks, according to people familiar with the briefing," reporting that "Mr. Steinberg . . . is seen by authorities as a potential witness against Mr. Cohen if he ever were to cooperate," and referencing emails between Messrs. Horvath and Steinberg, including the August 26, 2008 email discussed above); *id.*, Ex. D at 9-11 (Vanity Fair) (extensively discussing communications between Messrs. Horvath and Steinberg, including comments by lawyers describing the August 26, 2008 email as a red flag, and the involvement of Mr. Cohen in in the Dell trade); *id.*, Ex. C at 1-2 (Wall St. J.) (discussing emails between Messrs. Horvath and Steinberg quoted in the indictment, including the August 26, 2008 email, and the alleged conversation between Messrs. Steinberg and Cohen about the Dell trade); *id.*, Ex. K at 8-9 (Bloomberg) (reporting the government's strong desire to indict Mr. Cohen, and that "Steinberg is considered highly valuable to investigators. So far, however, he is not cooperating with them.").

The government will no doubt seek to introduce at trial the emails and witness statements that have made their way into so many press reports. The media's intense focus on this information and its purported link to Mr. Cohen threatens to further prejudice Mr. Steinberg. For example, the suggested implication from the August 26, 2008 email and the testimony surrounding it will be that Messrs. Steinberg and Horvath shared Dell information with Mr. Cohen, through another SAC portfolio manager. Potential jurors exposed to the reports of Mr.

Cohen's notoriety will be hard pressed to ignore the media's characterizations of Mr. Cohen and his connection to Mr. Steinberg in evaluating the significance of this aspect of the government's proof.

> **2.** *A Juror Questionnaire, Combined with Individual Questioning of Jurors As Needed, Will Assist the Court in Identifying and Addressing Juror Bias*

We respectfully submit that of the remedies available to trial judges faced with addressing the risk that substantial pretrial publicity exposed potential jurors to extraneous and prejudicial information and commentary, a jury questionnaire, combined with individual questioning of jurors as needed, are among the most modest.[4]

As Courts have widely recognized, potential jurors are more candid and more likely to disclose their true attitudes and experiences when responding privately, either in response to a written questionnaire or when examined separately, then when examined by a judge in open court. *See*, *e.g.*, *Skilling*, 130 S. Ct. at 2947 (Sotomayor, J., concurring in part and dissenting in part) (observing that follow-up questioning of individual jurors based on a comprehensive questionnaire distributed to venire "exposed disqualifying biases among several prospective

---

[4]   *See, e.g.*, *United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007) (approvingly surveying cases employing questionnaire to facilitate voir dire); *United States v. Whitten*, 610 F.3d 168, 184 (2d Cir. 2010) (approving district court's employment of a 54-page questionnaire that addressed, *inter alia*, "relevant media exposure" and prospective jurors' "opinions and biases"); *United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006) ("Prompted by . . . extensive publicity surrounding th[e] case, the District Court undertook a two-step voir dire process," the first step of which involved "prospective jurors complet[ing] a questionnaire drafted by the parties" which served as a basis for for-cause challenges, followed by individual questioning); *United States v. Rahman*, 189 F.3d 88, 121-22 (2d Cir. 1999) (praising, as "skillfully balanc[ing] the difficult task of questioning . . . a large jury pool with the defendant['s] right to inquire into . . . sensitive issues that might arise in the case," a jury selection process involving a lengthy screening process that included distribution of a nineteen-page questionnaire that inquired into pretrial publicity, among other things); *United States v. King*, 140 F.3d 76, 80 (2d Cir. 1998) (discussing district court's use of jury questionnaires where judge found that pretrial publicity portrayed defendant "in a very negative way").

jurors who had earlier expressed no concerns about their ability to be fair."); *see also Irvin*, 366 U.S. at 728 ("No doubt, each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father.  Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight."); *Jordan v. Lippman*, 763 F.2d 1265, 1281 n.19 (11th Cir. 1985) ("Another potential defect in the trial court's offer to propound only the statutory questions is that such questions were to be propounded to the jury panel as a whole. The courts have indicated that general inquiries as to impartiality, when directed to the group as a whole, are unlikely to elicit admissions of partiality."); *ABA Standards for Criminal Justice, Fair Trial and Free Press* § 8-3.5(a) (3d ed. 1991) ("If there is a substantial possibility that individual jurors will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to exposure should take place outside the presence of other chosen and prospective jurors. . . . for the purpose of determining what the prospective juror has read and heard about the case and how any exposure has affected that person's attitude toward the trial . . . .").

We understand that the Court has previously expressed concerns regarding the amount of time that the use of such a questionnaire could add to voir dire.  We respectfully submit that the Court's concerns regarding efficiency could be addressed by asking each potential juror to complete and submit his or her questionnaire the week prior to trial, which would give the government and the defense an opportunity to confer and agree well in advance of jury selection that certain potential jurors should be excused for hardship or cause.  The parties would then submit to the Court the names of those potential jurors as to which there is consensus based on

the questionnaire answers, thereby making progress towards qualifying a jury prior to the actual voir dire.[5]

> 3. *The Government Has Little Basis to Oppose the Use of A Juror Questionnaire or Individualized Voir Dire*

The government's own statements to the press and conduct with regard to its investigation of Mr. Steinberg are factors that have contributed to the prejudicial pretrial publicity.  In a statement issued the day of Mr. Steinberg's arrest and widely quoted in the press, the United States Attorney's Office, invoking popular anti-Wall Street sentiments, compared Mr. Steinberg's conduct to those of other "Wall Street insider[s]" convicted by that office:

> As alleged, Michael Steinberg was another Wall Street insider who fed off corrupt grapevine of proprietary and confidential information cultivated by other professionals who made their own rules to make money . . . with lightning speed in at least one case, Mr. Steinberg seized on the opportunity to cash in and tried to keep his crime quiet, as charged in the Indictment.  As alleged, where once Mr. Steinberg answered only to his own rules, now he will have to answer to the rule of law, like so many others before him.

*See* Wilcox Decl., Ex. J at 6-8.  In a Twitter feed issued later that day, the USAO reported that Mr. Steinberg's arrest made him the "81st person to be charged for insider trading by Manhattan U.S. Attorney," and reminded subscribers that "71 have been convicted."  *Id.*, Ex. J at 9.  On that same day FBI Assistant Director George Venizelos described Mr.

---

[5]   *See Skilling*, 130 S. Ct. at 2910 (approving voir dire that employed juror questionnaire, followed by individual juror examination at the bench and with opportunity for counsel from either side to pose follow-up questions); *see also*, *e.g.*, *Whitten*, 610 F.3d at 176 (affirming sufficiency of voir dire employing fifty-four page questionnaire and opportunity for parties to submit and object to proposed questions for court's conduct of voir dire); *United States v. Fastow*, 292 F. Supp. 2d 914, 921-22 (S.D. Tex. 2003) (observing in advance of high-profile, high-publicity criminal trial that implementing a "hybrid procedure" of jury selection that included (i) a juror questionnaire, (ii) an opportunity for counsel to confer with the court about questionnaire results, and (iii) an opportunity for counsel to subsequently question jurors individually would "ensure an  efficient, yet flexible, voir dire").

Steinberg as being at "the center of an elite criminal club, where cheating and corruption were rewarded." *Id.*, Ex. J. at 3.

In addition, in the months leading up to Mr. Steinberg's arrests, articles frequently reported on the progress of the grand jury's ongoing investigation and suggested that the prejudicial information was coming from government sources. For example, on February 13, 2013, the Wall Street Journal published on its website an article, which also appeared in print the next day, reporting that Mr. Horvath was "interviewed again on Jan. 23 by a federal prosecutor and the FBI at the office of the Manhattan U.S. Attorney . . . [during which he] told federal criminal investigators that he was pressured by his manager to gather inside information on technology stocks."[6] Other articles featured statements of prosecutors' internal plans and strategy, such as that prosecutors were "nearing a decision" on whether to bring criminal charges against Mr. Steinberg.[7] These statements were routinely attributed to "a person familiar with the investigation,"[8] "a person with direct knowledge of the investigation,"[9] "a person with knowledge of the case"[10] and "a person with direct knowledge of the case who requested anonymity because he was not authorized to discuss it publicly."[11] On the morning of Mr. Steinberg's arrest at approximately 6:00 a.m., a Wall Street Journal reporter knew to be present

---

[6]   Wilcox Decl., Ex. J at 11-13 (Wall St. J.).

[7]   Wilcox Decl., Ex. K at 3-4 (Reuters).

[8]   Wilcox Decl., Ex. J at 11-13 (Wall St. J.).

[9]   Wilcox Decl., Ex. I at 11-12 (N.Y. Times online).

[10]   Wilcox Decl., Ex. J at 14 (N.Y. Post).

[11]   Wilcox Decl., Ex. K at 5-7 (N.Y. Times).

KL3 2933613.9

to film Mr. Steinberg leaving his apartment in handcuffs flanked by FBI agents.[12]  The reporter,

who was interviewed about her eyewitness account and whose footage was immediately

available and widely shown as discussed above, *see supra* at 2-3, did not indicate how she came

to be at Mr. Steinberg's apartment with her camera at the ready on that particular early morning.

The government's actual statements upon Mr. Steinberg's arrest and the coverage of the

government's grand jury investigation and arrest of Mr. Steinberg contributed to the

pervasiveness and prejudice of the pretrial publicity.[13]

      B.     The Publicity Prior to Trial May Require Additional Remedial Measures

In making these requests to address the prejudicial media coverage well in advance of

trial, we are mindful that the level of adverse publicity may increase over the next few months

for reasons other than the timing of Mr. Steinberg's trial.  For example, the scope and content of

the press coverage will be impacted in the months between now and Mr. Steinberg's currently

scheduled trial date of November 18, 2013 by whether the government makes charging decisions

regarding Mr. Cohen and/or SAC (or are reported to be close to such decisions), whether

investors of SAC take action because of the investigations that significantly impact SAC's

---

[12]   *See* Jenny Strasburg, *SAC Capital Trader Michael Steinberg Arrested*, Wall St. J. Live, Mar. 29, 2013, *available at* http://live.wsj.com/video/sac-capital-trader-michael-steinberg-arrested/3E804A30-DE62-43C2-A9CC-F8F20980C336.html#!3E804A30-DE62-43C2-A9CC-F8F20980C336.

[13]   *See, e.g.*, *Dow Jones*, 842 F.2d at 611 (observing that "mitigating measures" to address grand jury leaks include "change of venue, trial postponement, a searching voir dire, emphatic jury instructions, and sequestration of jurors," each being "different tool" which, depending on context of its use, "provides a different effect." (citations omitted)); *United States v. Friedman*, 854 F.2d 535, 582-84 (2d Cir. 1988) (assuming arguendo that persistent leaks of grand jury testimony were responsibility of government, but declining to disturb convictions where, *inter alia*, change of venue, use of jury pool from yet another city, and method of voir dire "removed any possibility of prejudice at trial"); *United States v. Eisen*, CR-90-00018, 1991 WL 180400, at *1 (E.D.N.Y. Sept. 3, 1991), *aff'd*, 974 F.2d at 261 ("extensive voir dire" included investigation into allegations of potential prejudice from Village Voice article referencing grand jury testimony of prospective trial witnesses).

business prospects, whether there are developments involving other former SAC employees, or whether there are other developments that generate additional press interest.

For these reasons, we respectfully request leave to seek further relief as may be necessary based on the media coverage during the period leading up to Mr. Steinberg's scheduled trial to ensure that the venire is not infected by coverage of extraneous and prejudicial topics or commentary that have no legal bearing on Mr. Steinberg's guilt or innocence.

## II.   THE GOVERNMENT SHOULD SUPPLY A FINAL AND SUFFICIENTLY DETAILED BILL OF PARTICULARS SOONER, NOT LATER, THAN IT DID IN THE *NEWMAN/CHIASSON* CASE

### A.   Given Its Repeated Assertions of Readiness, the Government Should Be Prepared To Provide Final Particulars No Later than Monday, August 19, 2013

The government does not dispute that Mr. Steinberg is entitled to know more about the insider trading conspiracy alleged in the indictment.  To that end, the government has agreed to identify certain information relating to the charges, including 1) the stocks that the government will claim at trial Mr. Steinberg traded based on material non-public information; and 2) the identities of all of Mr. Steinberg's alleged co-conspirators known to the government.  The government however has refused to commit to those particulars and seeks to wait until one month prior to trial before providing the final information that can be relied on by the defense. Letter from Barry H. Berke & Steven S. Sparling to Antonia M. Apps (June 28, 2013) at 2 (Wilcox Decl., Ex. L at 7).  The government's position is surprising given its prior representations to this Court in support of an early trial date, specifically that Mr. Steinberg needs less time to prepare because he already knows the particulars of the charges against him from the prior trial of Messrs. Newman and Chiasson (which the government was required to produce 60 days before the scheduled trial date).  Mr. Steinberg does in fact need the actual particulars to adequately prepare for trial, especially in light of the tremendous number of

documents and other materials that need to be reviewed and analyzed depending on the substance of those particulars.  As a result, Mr. Steinberg respectfully submits that the government should be required to produce a final bill of particulars no later than three months before trial.

At Mr. Steinberg's initial appearance in March, counsel for the government expressed her opinion that this case and *United States v. Newman*, No. S2 12 Cr. 121 (RJS) (S.D.N.Y.) (hereinafter *Newman/Chiasson*) are "very, very similar."  Mar. 29, 2013 Tr. at 6 (Wilcox Decl., Ex. M at 4).  At the parties' next appearance before this Court on May 3, the government argued for a trial this year – over Mr. Steinberg's objection – by stressing the commonality between this case and the last.  Specifically, the government argued that Mr. Steinberg's preparation would be facilitated because the government had already disclosed its bills of particulars from the last trial, which, with the exception of "one or two names," set forth the particulars relevant here.  May 3, 2013 Tr. at 9 (Wilcox Decl., Ex. M at 7).  Specially, Ms. Apps said the following:

> We provided over the bills of particulars from the last trial, so I understand that Mr. Berke wants to relitigate bills of particulars, but it's the same issue.  They've largely been provided.  There may be one or two names outstanding, based on statements that Mr. Horvath has made to us, but all of that has been done.

*Id.*  Agreeing that "there's a lot of plowed ground already," *id.* at 13 (Wilcox Decl., Ex. M at 8), the Court set a trial date of November 18, 2013.

Shortly after the May 3 conference, acknowledging that the government had stated its intent to rely in this case on the final bill of particulars that it submitted in *Newman/Chiasson*, Mr. Steinberg's counsel requested certain additional information from the government.  Letter from Barry H. Berke to Antonia M. Apps & John T. Zach (May 14, 2013) at 2 (Wilcox Decl., Ex. L at 2).  Specifically, counsel requested, *inter alia*, that the government 1) "identify each and every transaction and Technology Company in which the government contends Mr. Steinberg

executed or caused to be executed trades based in whole or in part on information that Mr. Steinberg knew was 'Inside Information'"; and 2) "identify any and all known coconspirators that are not identified in the [final *Newman*/*Chiasson* bill of particulars]." *Id.* at 3 (Wilcox Decl., Ex. L at 3).  The government responded on June 7, 2013, claiming to have satisfied counsel's request by providing information on certain trading activity of Sigma Capital, and other entities in the securities of Dell, Inc. and Nvidia Corporation, identifying 9 other stocks with respect to which the government alleges "inside information" was obtained or attempted to be obtained, and naming 15 alleged co-conspirators.  *See* Letter from Antonia M. Apps to Barry H. Berke & Steven S. Sparling at 1-2 (June 7, 2013) (Wilcox Decl., Ex. L at 4-5); Initial Bill of Particulars at 2, 7-9 (Wilcox Decl., Ex. N at 2, 7-9).  But importantly, the government refused to commit to the finality of what it did disclose and expressed its intent to provide different or additional particulars in the future by stating that the "Government may supplement its Initial Bill of Particulars with further specific stocks, securities trades based in whole or in part on inside information, or coconspirators,"  (Wilcox Decl., Ex. L at 5), and "[t]he Government will provide further particularity regarding proof of securities transactions it intends to introduce at trial (if any) in subsequent bills of particulars."  (Wilcox Decl., Ex. N at 2, 7-9).

In other words, the government has reserved the right to add new stocks, new trades, and new co-conspirators until just one month before trial.  This is very different from what the government said back in May when it pushed for an early trial date on the ground that it had "largely" provided Mr. Steinberg with all necessary particulars other than "one or two names." (Wilcox Decl., Ex. M at 7).  Based on the government's representations to the Court that Mr. Steinberg would need less time to prepare for trial because he already has the relevant particulars from the *Newman*/*Chiasson* trial, other than "one or two names," the government should be

ready to define its allegations now.  Instead, the government seeks an additional five months

from its May representations to identify new stocks and co-conspirators up until one month

before trial.  In *Newman*/*Chiasson*, this Court noted that "there has to be a pencils-down time"

after which the government could not supplement its bill of particulars, Transcript of Hearing,

*Newman*/*Chiasson* (June 28, 2012) at 13 (Wilcox Decl., Ex. M at 12), and ordered the

government to produce its final bill of particulars no later than two months before trial.  *Id.* at 18

(Wilcox Decl., Ex. M at 13).

Here, as the government itself acknowledged at the May 3 conference, it should need less

time, not more, to identify the actual stocks, trades and co-conspirators that will be the subject of

the November 18 trial.  Based on the government's own representations, the same reasons that

the Court relied upon in requiring the government to stop rewriting its bills of particulars well in

advance of the *Newman*/*Chiasson* trial, and Mr. Steinberg's actual need to know these details as

soon as possible to prepare his defense, as described more fully below, we respectfully request

that the Court order the government to identify by Monday, August 19, 2013 (three months prior

to trial) the stocks it alleges Mr. Steinberg traded based on material non-public information, the

actual trades it will seek to introduce at trial, and all co-conspirators it alleges were part of the

conspiracy charged against Mr. Steinberg.

     B.     Only a Final Bill of Particulars Can Satisfy the Important Purpose of Minimizing
               Unfair Surprise as to the Stocks at Issue and Identities of Alleged Co-Conspirators

The purpose of a bill of particulars is of course to describe charges with sufficient

precision so that a defendant can prepare his defense, avoid surprise at trial, and be protected

against double jeopardy.  *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *overruled on

other grounds as recognized by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010).  The first

two of those three objectives cannot be met when a bill of particulars is in a state of flux – a

moving target subject to change at the government's whim.  A month ago, in its "Initial" Bill of Particulars, the government identified a eleven stocks that might be the subject of proof at the upcoming trial, sixteen co-conspirators that it alleges were part of the charged conspiracy, and a range of specific securities transactions in Dell and Nvidia that it intends to introduce at trial. (Berke Decl., Ex. 3 at 2, 7-9).  We respectfully submit that Mr. Steinberg needs to know that these are the particulars that matter so that he can prepare to defend against the government's actual allegations and proof.  At this juncture, after a full trial and the government's assurances that the *Newman/Chiasson* particulars would also apply here, we submit  there is no reason for the government to delay finalizing its disclosures.

While all bill of particulars motions must cite to the Second Circuit's seminal case, *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987), the basis for that reversal is relevant here because a bill of particulars that can be relied upon is "vital to [the defendant's] understanding of the charges pending and to the preparation of a defense." *Id.* at 575.  And there can be no doubt that, as in *Bortnovsky*, where a timely served bill of particulars "would have prevented the Government in its attempt to proceed furtively," *id.*, the same is needed here to prevent unfair surprise to Mr. Steinberg.

The Second Circuit also has made clear that allegations of a conspiracy spanning a long period of time and potentially involving numerous parties should be particularized to a greater extent than allegations involving more straightforward crimes.  *See United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998) ("a bill of particulars or other adequate disclosure is appropriate where a conspiracy count covers a complex series of events over a number of years, but provides only the bare bones of the charge"); *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234-35

- 27 -

(S.D.N.Y. 2000) (finding that complexity of conspiracy case, along with other factors, made particularization of allegations necessary to adequate preparation of the defense).

From July 2007 through 2009, the approximate life of the alleged conspiracy, Mr. Steinberg executed more than 2.3 million trades involving more than 300 stocks.  Should the government identify any new stocks that it believes are part of the alleged conspiracy or specific securities transactions that it will seek to prove at trial, Mr. Steinberg would have to undertake an enormous amount of additional work to prepare his defense, in addition to the work necessary to be prepared for the fall trial date.  For each additional stock or specific transaction, Mr. Steinberg would have to analyze thousands of documents, including emails, text messages, phone calls, trading records, company disclosures and other materials to piece together the details, motivations and circumstances surrounding the trading of that stock or the specific securities transaction.  Those documents would include more than 33,000 communications between Mr. Steinberg and Jon Horvath, the only person in the alleged tipping chain alleged to have communicated directly with Mr. Steinberg, more than 23,000 communications between Mr. Horvath and the other alleged research analyst co-conspirators, and more than 1.1 million documents that directly relate to Sigma Capital or S.A.C., as well as a vast array of other documents, such as sell-side reports, press releases, SEC filings, and media articles.  Because Mr. Steinberg is alleged to have been a fourth-level tippee, and the alleged tipping chain permeated several different firms, Mr. Steinberg also would have to analyze for each alleged stock and trade a massive quantity of other communications among each of Mr. Steinberg's alleged co-conspirators and multiple issuers to discern the nature, source, quality, description, availability, and use of the information that was allegedly obtained illegally and shared.  These communications are among the more than 9.7 million documents spanning approximately 23.9

million pages that have been produced in such a variety of formats that conducting effective searches is extremely difficult.  Lastly, given the nature of the transactions and course of dealings alleged by the government, understanding all the relevant details relating to any additional stock or specific security transaction would require significant analysis and potentially seeking additional information through the use of subpoenas and other means that require significant lead time.  We respectfully submit that to thrust such a burden on Mr. Steinberg within a month before trial is neither necessary nor fair.

For the same reasons, the government should be required to finally identify all of Mr. Steinberg's alleged co-conspirators.  Like the superseding indictment in *Newman/Chiasson*, the indictment against Mr. Steinberg alleges a conspiracy involving persons "known and unknown" to the grand jury.  *Compare* Superseding Indictment, *Newman* (Aug. 28, 2012), ECF No. 112, at ¶¶ 6, 7, 8, 28, 29, 30 *with* Indictment, *Steinberg* (Mar. 29, 2013), ECF No. 230, at ¶¶ 26, 27, 28. Ten months ago, the government was able to identify with specificity each of the known co-conspirators.  *See* Bill of Particulars, *Newman/Chiasson* (Aug. 29, 2012) at 2 (Wilcox Decl., Ex. O at 2).  Now, however, the government has reserved the right to supplement the final list that it provided nearly a year ago.  Having already gone to trial against two of Mr. Steinberg's alleged co-conspirators and having unlimited access to nearly half a dozen other alleged co-conspirators who are cooperating, the government can hardly claim an inability to identify all known co-conspirators.[14]

---

[14]   Courts have consistently mandated disclosure of the identity of co-conspirators where, as here, a vast and complex conspiracy involving many co-conspirators is alleged, the government has not otherwise provided adequate notice of the particulars, pretrial discovery is voluminous, and there is no potential danger to co-conspirators or harm to the government's investigation. *See, e.g.*, *United States v. Oruche*, No. 07-CR-124 (WHP), 2008 WL 612694, at *4 (S.D.N.Y. Mar. 5, 2008) (addressing need to narrow issues for trial and ordering identification of co-conspirators by each paragraph where "others" appeared); *United States v. Lino*, No. 00-CR-632

As with stocks and securities transactions, Mr. Steinberg also needs to know the identity of all the alleged co-conspirators to adequately prepare for trial.  This information is needed to understand the alleged scope of the conspiracy at Sigma,, and beyond, to determine what statements could be admissible as co-conspirator statements, and to know where the government is drawing the line regarding the purported wrongdoers alleged to have conspired with Mr. Steinberg.  In addition, the disclosure of new co-conspirators would require the same sort of review of the tens of millions of documents described above, as well as additional analysis and potential third-party discovery to adequately prepare to address the new allegation at trial.  For all these reasons, we respectfully submit that requiring the government to produce that list by August 19 is necessary for Mr. Steinberg to have adequate time to prepare for trial, and provides the government more than sufficient time to determine whether to alter the list it provided nearly a year ago in *Newman/Chiasson*.

---

(WHP), 2001 WL 8356, at *12-13 (S.D.N.Y. Jan. 2, 2001) (granting same); United States v. Savin, No. 00 CR. 45(RWS), 2001 WL 243533, at *5 (S.D.N.Y. Mar. 7, 2001) (granting motion to identify co-conspirators where conspiracy spanned six years and six corporations, and government provided 100,000 pages of discovery); *United States v. Feola*, 651 F. Supp. 1068, 1131-34 (S.D.N.Y. 1987) (granting demand for bill of particulars specifying "the names of all persons whom the government will claim at trial were co-conspirators").

Dated:  New York, New York
        July 8, 2013

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By:  /s/  Barry H. Berke
     Barry H. Berke
     Steven S. Sparling
     Robin M. Wilcox

1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100  (Phone)
(212) 715-8000  (Fax)
bberke@kramerlevin.com
ssparling@kramerlevin.com
rwilcox@kramerlevin.com
*Counsel for Defendant Michael S. Steinberg*