UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
UNITED STATES OF AMERICA
                                              :
            - v. -                               S4 12 Cr. 121 (RJS)
                                              :
MICHAEL STEINBERG,
                                              :
                  Defendant.
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT MICHAEL STEINBERG'S MOTIONS *IN LIMINE***


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
      of America.

ANTONIA M. APPS
HARRY A. CHERNOFF
Assistant United States Attorneys

**PRELIMINARY STATEMENT**

The United States respectfully submits this memorandum of law in opposition to the motions *in limine* filed by the defendant Michael Steinberg on October 25, 2013 seeking (i) to preclude the Government from eliciting any testimony about the prosecutions related to Galleon Group LLC ("Galleon"), and (ii) to exclude certain of the compliance and training presentation materials given by SAC Capital during the defendant's tenure at SAC.  For the reasons set forth below, the defendant's motions should be denied.

**I.   STEINBERG'S MOTION TO PRECLUDE REFERENCES TO GALLEON AND SUBSEQUENT PROSECUTIONS IS WITHOUT MERIT.**

Steinberg moves to preclude highly probative evidence arising from his reaction to the Galleon arrests because, he contends, a mere mention of Galleon will work prejudice upon him. It is, however, far-fetched to contend that any reference to an unrelated set of prosecutions will cause jurors to lose all objectivity in evaluating the evidence against Steinberg.  Moreover, the evidence against Steinberg that relates to his reaction to the events that surrounded Galleon are highly probative of Steinberg's consciousness of guilt and efforts to cover-up his crimes.

Steinberg soft-pedals the relevant proof as consisting of cooperating witness Jon Horvath's anticipated testimony that "Mr. Steinberg followed the investigation as it unfolded, discussed these news events with his team, and cautioned his team to be careful with whom they dealt."  (Def. Mem. at 6).  Even this version of events, and the details of those discussions, would appear to be relevant, but we expect the testimony will be far more detailed and probative.  The conversations about which Horvath will testify that relate to Galleon include the following:

- Following the Galleon arrests in October 2009, Steinberg frequently discussed developments in the case with his employees, including at times Horvath, and expressed heightened concern about the possibility of investment professionals cooperating with the Government.  For example, on one occasion, Steinberg reported, in substance, that Steven Fortuna, a hedge fund manager who had who had a prior relationship with another SAC Capital portfolio manager, had called

1

that portfolio manager and pushed for improper information in a manner that raised suspicions. Steinberg instructed Horvath to be careful about whom he talked to.

Additionally, the Government intends to other incriminating conversations between Horvath and Steinberg that follow law enforcement actions taken in connection with other insider trading investigations:[1]

- In November 2010, the hedge funds Diamondback Capital Management, LLC ("Diamondback") and Level Global Investors, LP ("Level Global") had been the subject of search warrants executed by the FBI.  Diamondback was the hedge fund where coconspirators Jesse Tortora (who supplied the Dell inside information to Horvath and Steinberg), and his portfolio manager Todd Newman, worked.  Co-conspirators Anthony Chiasson and Sam Adondakis, who also received the Dell information, worked at Level Global.  Steinberg and Chiasson knew each other, and the Government expects the proof at trial to show that Steinberg knew that Chiasson also received the Dell inside information.  Shortly after the news of the search warrants broke, Horvath and Steinberg encountered each other at an investor conference in Arizona.  Steinberg immediately asked Horvath, in substance, what Horvath would say to the FBI when he was asked how Tortora "was on Dell."  Horvath responded, in substance, that he would tell the FBI that Tortora was "good" or "quite good" on Dell. Steinberg instructed Horvath to say that Tortora was "just OK."

- In December 2010, the *Wall Street Journal* reported that the FBI had tried to enlist (unsuccessfully) a corrupt research analyst John Kinnucan to cooperate against Michael Steinberg.   Following this article, Steinberg had a series of conversations with Horvath and another analyst who worked for Steinberg in an effort to allay fears about Steinberg being a target of the Government's insider trading investigations.  In one of those conversations, Steinberg said in substance that he would be "o.k." because he was a sufficient number of steps removed from the source of information.  In response, Horvath said words to the effect of, "A lot of good that does me," and abruptly left the conversation.

---

[1] The defendant objects to reference to the Galleon arrests and "subsequent prosecutions," but later identifies "over fifty people who have been convicted or have pled guilty in connection with [the Galleon] probe." (Def. Mem. at 1). Because the Government expects to elicit proof about other law enforcement actions, such as the arrests relating to the Government's investigation of Primary Global Research ("PGR"), that the defendant may consider to fall within the "Galleon probe," the Government sets forth below testimony that will relate to those other law enforcement actions, of which Galleon is only the first in time.

- Following arrests arising out of and relating to the Government's investigation PGR in late 2010 and early 2011, Horvath read a news article about the fact that PGR had a "private network" in which hedge fund professionals could arrange for exclusive access to public company insiders who provided inside information in exchange for fee. After reading this news article, Horvath informed Steinberg, in substance, that PGR offered a separate service whereby they would sell inside information clients. In response, Steinberg asked, in substance: "so that's where Jesse [Tortora] got the Dell information from?"

- In 2011, Horvath was interviewed by SAC compliance officers and outside counsel on two occasions. Following one of those interviews, Horvath told Steinberg, in substance, that he was surprised that he was not questioned about "the Dell stuff," rather he was only asked about "PGR and Kinnucan." Steinberg responded, in substance, by stating that compliance at SAC was "slow."

- In 2008, Steinberg had suggested to his analysts that they should refer to a particular person by flipping the initials. *See* GX 2200 (Exh. A hereto). During the unfolding of the various law enforcement actions described above, Steinberg was interviewed by compliance officers at SAC. After his meeting with compliance, Steinberg reported to Horvath, in substance, that he had been informed by compliance that they had reviewed trading in Steinberg's portfolio, and they were "in the clear," but Steinberg indicated that he did not have a good explanation for compliance as to why they flipped initials in emails. Steinberg instructed Horvath to say, if asked, that the flipping of the initials was done to hide trading ideas from competitors at the firm.

The defendant seeks to preclude any reference to the Galleon arrests at trial because the manner in which the Galleon arrests have been portrayed in the media suggests that Galleon is synonymous with insider trading and "Wall Street corruption." (Def. Mem. at 1). The defendant's concerns about the prejudice arising from reference to Galleon (or any of the other law enforcement events described above) are overstated. The Government plans to elicit no more about Galleon or any other law enforcement action than is necessary to provide the relevant context to Steinberg's statements and his reactions to the statements of others. In no other way does the Government intend to characterize any of these law enforcement actions as highly significant events.

3

The defendant's contention that jurors will be familiar with the Galleon investigation and immediately associate Galleon with Wall Street corruption is disproven by his own argument. The defendant points to the fact that during *voir dire* in the *Newman/Chiasson* trial, a juror was excused after professing a bias based on conversations with her husband in which he made a connection between Galleon and SAC.  But the fact that *only one* juror from a panel of over seventy drew the connection suggests that few jurors will draw the negative association that the defendant fears.  Even if such fears were well-founded, the appropriate remedy would be to address it through *voir dire* or a limiting instruction to the jury, rather than preclude the Government from offering highly relevant evidence as to Newman's state of mind.  *See United States* v. *Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008) (affirming conviction where district court admitted evidence linking defendant to a terrorism trial in which he was not charged and gave a cautionary instruction).

In contrast to the defendant's concerns about prejudice, the probative value of the conversations between Steinberg and Horvath in the aftermath of the various law enforcement actions is compelling.  The evidentiary items listed above are highly probative of Steinberg's consciousness of guilt.  Additionally, the fact that Steinberg made such unguarded statements to and before Horvath is probative of the relationship of trust between them.  Courts have routinely admitted evidence of other bad acts under Rule 404(b) of the Federal Rules of Criminal Procedure to demonstrate trust among coconspirators and to prove consciousness of guilt.  Surely most Rule 404(b) evidence is far more prejudicial than the mention of other insider trading investigations, including Galleon.

These incriminating conversations will make no sense to the jury if Horvath is not permitted to explain their context – namely the recent law enforcement investigations.  Indeed, it

4

is the fact that these conversations took place in the aftermath of the various law enforcement actions that makes them incriminating. Accordingly, Steinberg's motion to exclude reference to the Galleon arrests or other subsequent law enforcement actions should be denied.

## II. THE COURT SHOULD ADMIT THE VARIOUS SAC CAPITAL COMPLIANCE POLICIES AND TRAINING MATERIALS THAT STEINBERG CHALLENGES.

The defendant challenges the admissibility, each on separate grounds, of three groups of exhibits which are comprised of compliance training materials used at SAC Capital.

### A. Compliance Presentations by Outside Lawyers

Steinberg challenges the admissibility of two exhibits, GX 2030 and GX 2031, which consist of the PowerPoint presentations used in connection with compliance training on October 12, 2006 and July 21, 2008 by outside lawyers. Steinberg points out that, with respect to four other such presentations, there are attendance sheets which Steinberg signed, but there is no "clear evidence" that he attended the presentations by outside counsel.

Nevertheless, there is adequate circumstantial evidence to admit the documents. Sign-in sheets were created for mandatory in-house training by SAC compliance officers. For the two outside sessions, because they were optional, no such sign-ins were created (as opposed to a situation in which there were sign-ins lacking Steinberg's name). But the firm presumably went to some effort to have these compliance experts, including former high-level SEC officials, give presentations to SAC personnel, who were encouraged to attend: as the attached firm-wide e-mails indicate, the presentations were described as "required" for the addressees, which included portfolio managers, and those who were "unable to attend this required session" were directed to report this to an administrative employee.

Therefore, while we agree that there is no direct evidence of Steinberg's attendance at the special training sessions, this argument merely goes to the weight of the circumstantial evidence,

5

and is not a reason to preclude entirely this probative evidence of Steinberg's state of mind with respect to the offense conduct.

B. <u>The September 23, 2009 Compliance Training</u>

Steinberg also moves to preclude evidence of the training he attended on September 23, 2009, because this post-dated the last date his is alleged to have traded illegally. However, as described above in Section I, this training was right before the Galleon arrests in October 2009. Accordingly, just as Steinberg's post-Galleon conduct is relevant to demonstrating his consciousness of guilt, the September 2009 training makes up part of this consciousness. Accordingly, it is probative and admissible.

C. <u>Compliance Training Materials Discussing the SEC Enforcement Environment</u>

Steinberg also challenges the admissibility of portions of the training materials concerning SEC enforcement priorities. Steinberg contends that the materials, which bespeak a law enforcement focus on hedge funds, are inadmissible hearsay. They are not: the statements are obviously not being offered for the truth of the statements concerning the SEC's focus on hedge funds, which is irrelevant, but are being offered as circumstantial evidence of Steinberg's state of mind when he engaged in insider trading at a hedge fund. Every act that Steinberg took or omitted or concealed in the course of the offense conduct was done with the knowledge he acquired at mandatory training that hedge funds were a particular focus of law enforcement.[2]

D. <u>Use of Examples and Hypothetical in the Training Materials</u>

Having first raised the complaint that the training materials misstate the law, Steinberg then complains that the training materials make use of examples which "have no answers or analysis of the issues." (Def. Mem. at 9). Of course, hypotheticals and examples are commonly

---

[2] Steinberg contends that there is prejudicial risk from the suggestion that insider trading at hedge funds is rampant. The Government does not intend to make such argument, nor would that be effective.

used in training materials to highlight potentially abstract issues using concrete examples. The material Steinberg objects to is properly admissible and probative of the kinds of issues Steinberg was trained to spot. The Government could not credibly suggest and will not argue that the examples embody correct and complete statements of the law, or that they are on all fours with the perhaps more nuanced facts of the offense conduct.

But they are highly probative of the fact that Steinberg had been trained to recognize similar fact patterns and to seek further guidance if necessary, from compliance officers or counsel, and that, instead, he at minimum consciously avoided learning the additional facts and avoided seeking the necessary advice to determine whether his conduct was lawful.

Steinberg objects specifically to the examples given in GX 2039 and to the hypotheticals give in GX 2030. Each contains a scenario which is particularly close to the facts alleged against Steinberg, and therefore is especially probative.

In GX 2039, the material accompanying the September 23, 2009 training Steinberg received, the following example with respect to correct drafting of e-mails is given:

> **Internal SAC PM Communication –** SAC PM "Just spent an hour with the ABC public company CEO, this story is awesome – they will do 50 cents in Q3 (45 cents street) and 48 cents in Q4 (street 46 cents). I think It is a home run story. . . . I think we need to pick our spot there is no rush here as [no]one will pick this up that I have above but it's a major long here."
> . . . .
> **This is an example of not clearly distinguishing between what management actually said vs. the PM's analysis.**
>
> Recommended re-write:
>
> "Just spent an hour with the ABC CEO who seems quite positive. **Based upon my models and confirming my previous analysis** I believe they will do 50 cents in Q3 (45 cents street) and 48 cents in Q4 (street 46 cents). I recommend this as a major long. We have time to build our position as I believe most investors have not done a similar analysis." (Berke Decl. Exh. H).

7

To the likely extent that Steinberg will contend that he believed the inside numbers he was receiving were merely based on modeling done by his and other analysts, the fact that he received this specific training rebuts the defense. Steinberg was specifically trained to recognize when an e-mail was inappropriately ambiguous as to the source of its information; but, when he received e-mails that were at best ambiguous, Steinberg apparently did nothing to confirm the legality of trading on the information therein. Receiving this training on the eve of the Galleon arrests undoubtedly increased his anxiety and provides insight into his post-arrest behavior.

The outside training materials in GX 2030 contain certain hypotheticals which Steinberg characterizes as "intended to spark discussion." (Def. Mem. at 8). Another fair characterization of the hypotheticals is that they present scenarios in which caution and consultation with compliance would be appropriate. Again, the materials present a scenario that not dissimilar from the facts alleged in against Steinberg:

> "SAC analyst meets with Company Z's CEO and CFO regarding business projections for coming year.
>
> Analyst sends e-mail to others at SAC stating, 'Company Z will definitely miss its third and fourth quarter estimates. Earlier estimates were plainly overly-optimistic.'" (Berke Decl. Exh. C).

Accordingly, the training example focused specifically on the suspicious acquisition of potentially non-public information about quarterly results. It is fair to assume that the training used this example because a "read from someone at the company," to quote Steinberg's analyst, should always raise red flags. *See* GX 634 (Exh. B. hereto).

In both instances, Steinberg received practical training using realistic examples to capture abstract concepts, which is the exact point of this kind of training. The hypotheticals and examples do not purport to state the law of insider training, and any concern to that the effect will be addressed by the anticipated limiting instruction on these materials. But the examples do

8

highlight the fact that Steinberg was provided with training concerning conduct that should at least provoke further discussion with his team and with compliance. He did nothing of the sort because he acted with criminal intent.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court deny the defendant' motions *in limine*.

Dated: November 1, 2013
      New York, New York

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

               By:   ___/s/_____
                     Antonia M. Apps
                     Harry A. Chernoff
                     Assistant United States Attorneys
                     Tel. No.: (212) 637-2198/2481