**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

BARRY H. BERKE
PARTNER
PHONE 212-715-7560
FAX 212-715-7660
BBERKE@KRAMERLEVIN.COM

May 14, 2014

**BY EMAIL AND ECF**

The Honorable Richard J. Sullivan
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re: *United States v. Michael Steinberg*, S4 12 Cr. 121 (RJS)

Dear Judge Sullivan:

On behalf of Michael Steinberg, we respectfully request that the Court consider this response to certain issues raised by the government in its sentencing memorandum submitted on May 9, 2014. In particular, we explain our opposition to the government's argument that trading by Steven Cohen should be included within Mr. Steinberg's gain calculation. We also respond to certain assertions in the government's memorandum that we believe mischaracterize the evidence presented at trial or misstate our sentencing arguments.

**I.      Mr. Steinberg's Gain Calculation Should Not Include Trading by Steven Cohen**

The government's argument in support of holding Mr. Steinberg accountable for the losses avoided by Mr. Cohen on Dell in August 2008 fails as a matter of proof and as a matter of law. Before directly responding to the government's argument – and as further evidence of the weakness of the government's position – we first set forth the full history of the government's shifting positions with respect to the proper calculation of Mr. Steinberg's gain under § 2B1.4.

In its initial conversations with undersigned counsel on the question of gain under § 2B1.4, the government informed us that it would seek to include only the trading gains of the Steinberg Portfolio (i.e., $1.82 million). Based on these conversations, we informed the Probation Department that the defendant did not dispute the government's gain calculation. Subsequently, the government reversed its position and pressed Probation to include in its gain calculation not only the trading gains in the Steinberg Portfolio, but also the gains (or losses avoided) in the COHEN and SELECT accounts. (PSR ¶ 27). We objected on Mr. Steinberg's behalf, and the Probation Department refused to include either. (PSR ¶ 35).

The government filed no objection to the 51-to-63 month Guidelines calculation in the pre-sentence report, choosing not to challenge the Probation Department's rejection of the government's arguments regarding the proper gain calculation. *See* Fed. R. Crim. P. 32(f)(1)

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

The Honorable Richard J. Sullivan
May 14, 2014

(requiring objections, including objections to "sentencing guideline ranges," to be filed "within 14 days after receiving the presentence report").

Instead, a week after all such objections were due, the government filed its sentencing submission with the Court. In that submission the government changed its position again, conceding there was no basis for its urging of Probation to include gains from the SELECT account because there was no evidence Mr. Steinberg even knew the SELECT account existed. (Gov't Mem. at 26 n.23).

The government's submission also concedes – as we previously pointed out to Probation – that Mr. Cohen's gains (or losses avoided) cannot be attributed to Mr. Steinberg on the theory that he and Mr. Cohen acted "in concert" within the meaning of the Commentary to § 2B1.4 since the government's position throughout this case has been that Mr. Cohen was a "non-coconspirator" whose trading was "irrelevant."[1] *See Rutledge v. United States*, 517 U.S. 292, 298-300 (1996) (holding that "the plain meaning of the phrase 'in concert' signifies mutual agreement in a common plan or enterprise," and thus a requirement that the defendant act "in concert with" others can be satisfied only by proof of a conspiracy – "an actual agreement among the parties").

Having abandoned the SELECT account trading and conceded that the "acting in concert" prong is inapplicable, the government's change of heart with respect to including Mr. Cohen's trading is now left to rest on a thin and ultimately unsustainable reed: that the evidence allegedly shows that Mr. Steinberg "provided inside information" about the Dell August 2008 quarterly earnings to Mr. Cohen within the meaning of the Commentary to § 2B1.4 (defining "gain" as "the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant *or to whom the defendant provided inside information*" (emphasis added)).[2]

---

[1] (*See, e.g.*, Gov't Mot. To Exclude Certain Trading Records and Emails at 6, ECF No. 312 (arguing to exclude evidence of Mr. Cohen's trading because "the trading by these *non-coconspirators* [Messrs. Cohen and Plotkin] is irrelevant and would confuse the jury" (emphasis added)); Trial Tr. 1967:4-6 ("[W]e think Mr. Cohen's trading beyond the initial fact of the long position which set up the context is a distraction to the jury as well . . . ."); Trial Tr. 2605:4-7 (not taking issue with Court's observation regarding Mr. Cohen's and Mr. Plotkin's trading that "nobody is suggesting that they are illegal trades"); Final Bill of Particulars at 2, 7-10, ECF No. 299 (neither including Mr. Cohen among list of "known coconspirators" nor identifying Mr. Cohen's trades as trading activity in furtherance of the conspiracy)).

[2] Because the commentary to § 2B1.4 explicitly specifies the manner of calculating a defendant's gain, it overrides the relevant conduct guideline in § 1B1.3 which sets forth the manner of determining a defendant's offense conduct "[u]nless otherwise specified." U.S.S.G. § 1B1.3(a). Accordingly, the government's citation to § 1B1.3 in an effort to bolster its argument for including trading by Mr. Cohen is misdirected. (*See* Gov't Mem. at 25).

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

The Honorable Richard J. Sullivan
May 14, 2014

In attempting to show that Mr. Steinberg "provided inside information" to Mr. Cohen, the government focuses on Mr. Steinberg's statement to Mr. Horvath in an August 26, 2008 email: "I was talking to Steve [Cohen] about DELL earlier today, and he asked me to get the two of you [Mr. Horvath and Gabriel Plotkin] to compare notes before the print, as we are on opposite sides of this one." (GX 634; Govt. Mem. Ex. B). According to the government, this comment by Mr. Steinberg proves that he "relayed to Cohen his negative view on Dell and that his view was based on information Horvath had provided him." (Gov't Mem. at 24). And on this basis, the government asks the Court to increase Mr. Steinberg's Guidelines range by a full additional year or more in prison, from 51 to 63 months (total offense level 24) to 63 to 78 months (total offense level 26).

There are numerous problems with the government's legal theory and offer of proof on this point.

First, as a legal matter, the government's argument that the "provided" prong of the Commentary to § 2B1.4 must target *unknowing* recipients of information, since all knowing recipients are already covered under the "in concert with" prong, is unsound. The government bases its argument on the erroneous premise that "knowledge of the illegality of the information would *always* place the recipient in the 'in concert with' category in the comment to Section 2B1.4." (Gov't Mem. at 25 (emphasis added); *see also id.* ("The first prong – that the trader act 'in concert with' the defendant – covers individuals who had some level of awareness of the illegal nature of the information.")). The problem is that the Supreme Court has specifically rejected the argument that the phrase "in concert with" could require anything less than an actual conspiracy. *Rutledge*, 517 U.S. at 298 (holding that requirement that the defendant act "in concert with" others can be satisfied only by proof of a conspiracy – "an actual agreement among the parties"). Accordingly, the phrase "persons acting in concert with the defendant," as used in § 2B1.4, plainly refers only to co-conspirators of the defendant. The government therefore misses the mark when it argues that all knowing recipients of information fall under the "in concert with" prong – only co-conspirators do. And the government's related conclusion – that the "provided" prong must be designed to target recipients of information who lack all knowledge of illegality – is unfounded.

Second, as an evidentiary matter, the email the government cites (GX 634) does not specify – and cannot be used to establish – what Mr. Steinberg specifically said or conveyed to Mr. Cohen. All that Mr. Steinberg says in the email about what he communicated to Mr. Cohen is that he was "talking to Steve about DELL." The Commentary to § 2B1.4 requires more: proof that Mr. Steinberg actually "provided" Mr. Cohen with "inside information."

The government surmises that during their conversation Mr. Steinberg must have "relayed to Cohen his negative view on Dell" and that his view was based on the inside information provided by Horvath (Gov't Mem. at 24), but the cited email does not say that. Nor does the fact that Mr. Cohen asked Mr. Steinberg to get Mr. Horvath to "compare notes" with Mr. Plotkin imply that Mr. Steinberg must have orally conveyed his "negative view" to Mr. Cohen or the basis for it. Quite the contrary: the fact that Mr. Cohen's reaction to whatever it

- 3 -

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

The Honorable Richard J. Sullivan
May 14, 2014

was Mr. Steinberg discussed with him orally was to ask that Mr. Horvath and Mr. Plotkin compare notes shows, if anything, that Mr. Steinberg did *not* provide the alleged illegal "inside information" to Mr. Cohen. Based on the evidence in the record, it is just as plausible that Mr. Steinberg said to Mr. Cohen that he had some interesting information on Dell, or he had a contrarian thesis, or was thinking about Dell differently than Mr. Cohen seemed to be, or any number of other general comments. The relevant point is that divining what Mr. Steinberg actually said to Mr. Cohen during this conversation is pure speculation, and that is not a sufficient basis to find – even by a preponderance of the evidence – that Mr. Steinberg in fact "provided" actual "inside information" to Mr. Cohen during their conversation. *See, e.g., United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993) ("[S]peculation is not permissible under the Guidelines."). This is consistent with the government's own position at trial, where it did not identify Mr. Cohen's sales of Dell stock in August 2008 in its list of "Trading Activity in Furtherance of the Conspiracy." (*See* Final Bill of Particulars at 7-10).

Third, even if Mr. Steinberg's email (GX 634) could support a non-speculative inference that he told Mr. Cohen he had a "negative view" on Dell based on information from Mr. Horvath (which it cannot), that still would be insufficient to show Mr. Steinberg "provided" Mr. Cohen with "inside information." Conveying a generalized positive or negative "view" about a stock is not the same as conveying "inside information." The government cites no authority suggesting otherwise. Indeed, the government does not even suggest that Mr. Steinberg told Mr. Cohen his view emanated from an insider – it argues only that Mr. Steinberg attributed his negative view to his analyst, a person whose job it was to supply him with views on stocks. An investment professional's statement that he is "negative" on a stock, without additional specificity or a suggested basis of particular reliability, does not amount to the sharing of illegal material, nonpublic information. *See United States v. Contorinis*, 692 F.3d 136, 144 (2d Cir. 2012) (explaining that materiality and nonpublic status depend on both "the content of reports or tips" and "the reliability of the source").[3]

---

[3] The government's oblique reference to subsequent emails relating to the independent and intervening actions of Mr. Plotkin and Mr. Vaccarino does not shed any more light on the substance of the conversation between Mr. Steinberg and Mr. Cohen. The cited emails show that after Mr. Steinberg asked Mr. Horvath and Mr. Plotkin to "compare notes" regarding their respective theses on Dell, Mr. Horvath and Mr. Plotkin exchanged emails. (GX 634). Mr. Plotkin then expressed skepticism at Mr. Horvath's information, stating, "Well - if your checks are right, that is certainly negative. I will say however that it seems like recently (more in consumer) every time someone hits me with a check, it ends up being off . . . So we will have to see." (PSR ¶ 21). Mr. Plotkin then independently, without copying Mr. Horvath or Mr. Steinberg, forwarded Mr. Horvath's email with the alleged illegal inside information to Anthony Vaccarino, a research trader working for Mr. Cohen. (PSR ¶ 21; Gov't Mem. Ex. B). Mr. Vaccarino, in turn, without copying Mr. Plotkin, Mr. Horvath, or Mr. Steinberg, forwarded the email to Mr. Cohen. (PSR ¶ 21; Gov't Mem. Ex. B). Mr. Cohen, who has asserted that he does not believe he ever even opened or read the email written by Mr. Horvath, then had a short conversation with Mr. Vaccarino (the content of which is unknown) and sold off his Dell

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

The Honorable Richard J. Sullivan
May 14, 2014

### II. The Court Should Avoid an Unwarranted Sentence Disparity with Mr. Newman

The government concedes that, because Mr. Steinberg was not aware of the consulting payments made to Sandy Goyal, he is "in that respect" less culpable than Mr. Newman, who authorized those payments. (Gov't Mem. at 34). The government also concedes that Mr. Steinberg did not know significant details of the conspiracy that Mr. Newman knew, including that the source for the information from Nvidia was an accounting manager. (Gov't Mem. at 35). As set forth in our submission (Sentencing Mem. at 50, 53), Mr. Newman's direct involvement in the payments made to Mr. Goyal and his knowledge that the source of the Nvidia information was an accounting manager were key aspects of the government's arguments in summation at Mr. Newman's trial and at his sentencing concerning his culpability. Indeed, at Mr. Newman's sentencing hearing, the government acknowledged that the payments to Mr. Goyal were "perhaps the most significant" factor of Mr. Newman's offense conduct, and that his authorization of those payments made "him very much a participant in the breach in inducing the continued flow of the information." (*Newman* Sentencing Tr. 49). For this reason and many others, the government described Mr. Newman as a "central participant" in the conspiracy. (*Newman* Gov't Sentencing Mem. at 1-2). Despite its concessions about Mr. Newman's higher level of culpability, as well as the many other sharp distinctions between Mr. Newman and Mr. Steinberg, the government argues that Mr. Steinberg should receive a sentence within a Guidelines range of 63 to 78 months that is higher than Mr. Newman's 54-month sentence. (Gov't Mem. at 38). This argument cannot pass muster under § 3553(a)(6), and the government does not even attempt to analyze, let alone justify, such a disparate sentencing result. Because Mr. Steinberg was significantly less culpable than Mr. Newman, Mr. Steinberg's sentence should be significantly lower than Mr. Newman's sentence. (*See* Sentencing Mem. at 49-54).[4]

---

position. *See* White Paper Regarding the SEC's Administrative Proceeding Against Steven A. Cohen for Failure To Supervise at 23-24 (July 22, 2013), *available at* http://online.wsj.com/public/resources/documents/ SACWhitePaper0723.pdf ("White Paper"). Mr. Cohen asserts that his trading in Dell on August 26, 2008, was based exclusively on his tracking the trading of Mr. Plotkin, on whose recommendation his Dell position was based. *Id.* at 21. According to the White Paper, just six minutes before Mr. Cohen started selling Dell, Mr. Cohen's trading screen would have flashed in front of him in bright red that Mr. Plotkin was selling Dell. *Id.* at 20. Mr. Cohen has asserted that he closely tracked Mr. Plotkin's trading and had specifically instructed Mr. Vaccarino to alert him if any portfolio manager he was following traded in a direction contrary to their initial recommendation. *Id.* at 21 (citing to Mr. Vaccarino's testimony before the Securities and Exchange Commission). In accordance with this instruction, Mr. Vaccarino called Mr. Cohen just a few minutes after Mr. Plotkin started selling Dell (not immediately after Mr. Vaccarino received the email authored by Mr. Horvath); their phone call lasted 48 seconds; and Mr. Cohen directed the Dell sale approximately 15 to 25 seconds later. *Id.* at 24-25.

[4] The government's attempts to distinguish the sentences of Doug Whitman and Donald Longueuil are unavailing. For the most part, the government merely points to their respective

KRAMER LEVIN NAFTALIS & FRANKEL LLP

The Honorable Richard J. Sullivan
May 14, 2014

### III. The Government Mischaracterizes Certain Evidence To Bolster its Sentencing Arguments

In our sentencing memorandum, we analyzed the evidence that we believe clearly demonstrates that Mr. Steinberg's offense conduct reflects a lower level of knowledge, involvement, and culpability, relative to his alleged co-conspirators and to other similarly situated defendants in insider trading cases. (Sentencing Mem. at 39-63). For purposes of sentencing we do not address all of the government's characterizations of the evidence, but focus on certain instances in which the government mischaracterizes Mr. Steinberg's sentencing position or evidence related to his comparative culpability.

#### A. Mr. Steinberg's Position Sizing Is Not Comparable to Mr. Chiasson's

The government acknowledges (Gov't Mem. at 35-36) that Anthony Chiasson's August 2008 Dell trades were significantly larger than Mr. Steinberg's August 2008 Dell trades, but attempts to minimize the sentencing significance of Mr. Chiasson's higher level of conviction evinced by his large bets on Dell. (*See Chiasson* Sentencing Tr. 58 (Court addressing the sentencing significance of Mr. Chiasson's large Dell positions); Sentencing Mem. at 55-57 (discussing same)). In making these arguments, the government mischaracterizes the evidence. The government represents that Mr. Horvath described Mr. Steinberg's August 2008 Dell trade as "certainly with [sic] the top five short positions based on Horvath's recommendations." (Gov't Mem. at 14). The government further represents that "Horvath estimated [the August 2008 Dell trade] to be among the top five short positions Steinberg had taken into an earnings announcement in terms of size." (Gov't Mem. at 35).

Neither of the government's characterizations is faithful to Mr. Horvath's actual testimony. Mr. Horvath testified that he believed the August 2008 Dell trade was "for a short . . .[,] in the top five *of my recommendations into an earnings event*." (Trial Tr. 1112 (emphasis added)). Accordingly, the government's first characterization omits Mr. Horvath's limiting language "into an earnings event," and the government's second characterization omits Mr. Horvath's limitation that the trade was among the top five *recommendations by Mr. Horvath* –

---

gain amounts and the fact that Mr. Longueuil pled guilty but did not cooperate (Gov't Mem. at 36), factors that were already taken into account by their respective Guidelines ranges (51 to 63 months for Mr. Whitman and 46 to 57 months for Mr. Longueuil), which were identical to or overlapped with the Guidelines range recommend by Probation for Mr. Steinberg (51 to 63 months). The only other aspect of the offense conduct of Mr. Whitman or Mr. Longueuil addressed by the government relates to the scope of the conspiracies at issue; yet, Mr. Whitman was convicted of involvement in not one but two insider trading conspiracies, involving multiple co-conspirators and insider networks (*Whitman* Gov't Sentencing Mem. at 2), and the conspiracy in Mr. Longueuil's case was described by the government as "a large insider trading scheme that spanned numerous hedge funds and a number of securities." (*Longueuil* Gov't Sentencing Mem. at 1).

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

The Honorable Richard J. Sullivan
May 14, 2014

not among Mr. Steinberg's top five positions. Indeed, the trading data introduced at trial, which the government's submission ignores, showed that Mr. Steinberg regularly held much larger positions in single issuers throughout the period of 2007-2009. In fact, during this period, Mr. Steinberg held single-issuer positions that were larger than his August 28, 2008 Dell position on 2,694 distinct occasions, and in 78 different issuers. (*See* Disclosure of Daniel F. Fischel (Oct. 25, 2013), Ex. 8A, attached hereto).

### B.     The Substantial Evidence Showing Mr. Steinberg's Lower State of Knowledge

One way the government seeks to explain away the clear difference in quantity and quality between Mr. Tortora's "verbatim" and "constant" updates to Mr. Newman and Mr. Horvath's comparatively infrequent emails to Mr. Steinberg is by asserting that Mr. Tortora worked from home, while "Horvath spent the majority of his time in the office (when he was not travelling for work), and could speak to Steinberg in person." (Gov't Mem. at 35). This argument ignores Mr. Horvath's explicit testimony that he did *not* share – orally or in writing – every communication or even all the details he received from Mr. Tortora with Mr. Steinberg. (Trial Tr. 929). Moreover, Mr. Horvath did not testify that he spent the majority of his time in the New York office throughout his time at Sigma. In fact, he testified he was in the New York office only about "half the time," and progressively less as time went on, because he spent significant time working and living in San Francisco, and otherwise traveled extensively for work. (Trial Tr. 895-97, 1508-09, 2235-36).

The government also suggests that Mr. Steinberg knew more by arguing that the Court can assume that Mr. Steinberg received some emails from Mr. Horvath because of the format of some of Mr. Horvath's Tamale entries. But this argument too does not square with Mr. Horvath's testimony. For example, Mr. Horvath did not testify – as the government claims (Gov't Mem. at 8) – that he believed the May 12, 2008 Tamale entry had been emailed to Mr. Steinberg. Instead, Mr. Horvath testified simply that he believed that he emailed the information on May 12, 2008 *to Tamale*, as opposed to using alternative methods for inputting information into the database. (Trial Tr. 1002 ("Well, actually, this looks like an email because it's got my email signature at the bottom. So, it was probably an email *I did to Tamale*." (emphasis added))). In fact, Mr. Horvath testified that his primary way of entering information in Tamale was by sending an email directly to Tamale (Trial Tr. 948) – there was no evidence that Mr. Steinberg saw these entries or that Mr. Horvath routinely copied Mr. Steinberg on such data entries (Trial Tr. 949).

The government attempts to circumvent the evidence showing Mr. Steinberg's relatively lower level of knowledge by obscuring the timeline of events testified to by its own witness, Mr. Horvath. The government suggests that Mr. Steinberg knew as early as January 2008 "that Tortora's Dell 'checks' were based on information he was obtaining from a company insider." (*See* Gov't Mem. at 7). In fact, Mr. Horvath testified that he did not tell Mr. Steinberg that Mr. Tortora had a contact at Dell until "around kind of mid-2008 time frame." (Trial Tr. 930).

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

The Honorable Richard J. Sullivan
May 14, 2014

In addition, with respect to Nvidia, the government similarly suggests that Mr. Horvath was passing illegal information on Nvidia to Mr. Steinberg, and informing him that it "came from Danny who had a buddy who worked at NVIDIA," as early as "[i]n or around late 2008." (*See* Gov't Mem. at 18). Yet the evidence showed that Mr. Horvath did not pass any Nvidia inside information to Mr. Steinberg until 2009, and Mr. Horvath admitted he never informed Mr. Steinberg the information came from a company source until the "April 2009 timeframe." (Trial Tr. 1301, 2240). And of course Mr. Horvath acknowledged that he never revealed to Mr. Steinberg the insider's position at the company, even though Mr. Horvath learned the source was an accounting manager in February 2009. (Trial Tr. 2238, 2278).[5]

### C. The Government Misstates Our Argument Regarding the Evidence of Mr. Steinberg's Level of Knowledge

The government contends that "Steinberg argues that his sentence should be lower because, Steinberg asserts, the jury likely convicted him on a conscious avoidance theory." (Gov't Mem. at 30). This is an incorrect characterization of our argument. As we stated in our submission regarding the evidence showing Mr. Steinberg's relatively lower level of knowledge, the government's "heavy reliance on conscious avoidance arguments, and in particular on what Mr. Steinberg 'should have' known or done, was an acknowledgment that the proof concerning Mr. Steinberg's level of knowledge was of a lower degree and a different kind than, for example, the proof of knowledge with respect to Messrs. Newman and Chiasson." (Sentencing Mem. at 48). A defendant's knowledge of and involvement in the underlying conspiracy, relative to his alleged co-conspirators, is an entirely appropriate factor for the Court to consider at sentencing, and is in fact a factor that this Court considered in the recent case of Zvi Goffer. (Sentencing Mem. at 45).

---

[5] With respect to Nvidia, the government argues that "Steinberg could not have been mistaken that this high-level, nonpublic information was being disclosed by NVIDIA's investor relations department [because] . . . . Horvath informed Steinberg that NVIDIA's Investor Relations personnel had a firm policy about not returning Horvath's calls during the quiet period immediately preceding their public announcement of earnings." (Gov't Mem. at 18 n.19). Again, the government is mischaracterizing the clear evidence at trial that regardless of any practice it followed with respect to Mr. Horvath, Nvidia's Investor Relations department did in fact return calls to select investors late in the quarter, including even after the quarter closed. (*See* GX 957 (January 24, 2009 email from Mr. Horvath to Mr. Steinberg, stating that "I bet [Nvidia IR] will call dipak tho so we shd check w shd stay on top of it this week"); Trial Tr. 1353 ("I thought Dipak Patel had a better relationship with the Nvidia investor relations guys, so I am just saying that we should keep on top of Dipak in case he calls him back and see what he says."); GX 91 (chart reflecting that Nvidia's quarter closed on January 25, 2009, and announced earnings on February 10, 2009); *see also* Trial Tr. 1571-72 (Mr. Horvath's testifying that during the period when Nvidia's Investor Relations department would not talk to him, they would "speak with D[i]pak Patel")).

-8-

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

The Honorable Richard J. Sullivan
May 14, 2014

Conclusion

For the reasons set forth above and in our Sentencing Memorandum, we respectfully request that the Court impose a sentence on Mr. Steinberg of no greater than 24 months in prison.

Respectfully submitted,

Barry H. Berke
Steven S. Sparling
Megan Ryan

cc:   AUSA Antonia M. Apps (by e-mail)
      AUSA Harry Chernoff (by e-mail)

Exhibit 8a

## Value of Michael Steinberg's Positions on Key Dates for Dell Compared With the Value of His Other Positions

| Date | Company | Stock Equivalent Gross Market Value | Number of Issuer-Days With Larger Positions | Number of Issuers With a Larger Position On Any Day |
|---|---|---|---|---|
| 05/29/08 | Dell | $440,250 | 20,082 | 307 |
| 08/18/08 | Dell | $4,122,274 | 4,554 | 109 |
| 08/28/08 | Dell | $5,775,805 | 2,694 | 78 |
| 11/20/08 | Dell | $4,594,722 | 3,886 | 96 |
| 02/26/09 | Dell | $8,214,918 | 1,240 | 51 |
| 08/27/09 | Dell | $5,098,458 | 3,297 | 82 |

Notes: Value shown is stock equivalent gross market value (SEGMV), which is calculated by SAC Capital. On Key Dates, SEGMV is adjusted to exclude the effect of stock trading in relevant issuer after an earnings announcement, if applicable. Number of issuer-days and number of issuers shown exclude Dell, Nvidia and Sun Microsystems.
Sources: SAC2012_07601980, STEN_traderun_01012008_12312010.csv and STEO_traderun_01012008_12312010.csv.